PepsiCo, INC., Plaintiff,

v.

The GRAPETTE COMPANY, Inc., and
Grapette-Aristocrat, Inc.,
Defendants.

No. 1104.

United States District Court
W. D. Arkansas,
El Dorado Division.

Aug. 2, 1968.

of business in Camden, Arkansas.[1] The plaintiff seeks an injunction to restrain the alleged infringement of the plaintiff's trade-marks and for unfair competition.

More specifically, the plaintiff seeks to have the defendant, its officers, agents, employees, privies, successors and assigns, and all those holding by, through or under them, perpetually enjoined and restrained from using PEPPY in any manner or form, along or in combination with any other term, as an infringement of its trade-marks PEPSI-COLA, PEPSI and PEP-KOLA; plaintiff also seeks an order requiring the defendant to deliver for destruction all labels, signs, prints, boxes, packages, advertisements and any other items in its possession or under its control on which PEPPY appears, and all plates, molds, matrices and other means of making the same; and plaintiff seeks an order for the cancellation of the defendant's United States Trade-Mark Registration No. 211,209, and a declaration that the defendant is not entitled to registration of the trade-mark PEPPY on its pending application in the United State Patent Office, Serial No. 234,-414.

The defendant answers and raises the defense of estoppel and laches. Numerous pleadings have been filed as basis for this controversy. The issues are joined in the amended and supplemental complaint of the plaintiff filed December 12, 1966, and the second amended answer of the defendant filed November 16, 1967.

Jurisdiction is admitted and conferred under the Lanham Trade-Mark Act of July 5, 1946, as amended (15 U.S.C.A. § 1051 et seq.). This suit is also brought under §§ 1338 and 1391 of the Judicial Code (28 U.S.C.A. §§ 1338 and 1391). Jurisdiction is also based on diversity of citizenship, the matter in controversy exceeding, exclusive of interest and

Mahony & Yocum, El Dorado, Ark., Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff.

Walter H. Laney, Jr., Camden, Ark., Stevens, Davis, Miller & Mosher, Washington, D. C., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, Chief Judge.

This is an infringement action brought by the plaintiff, PepsiCo, Inc., a Delaware Corporation, having its offices and principal place of business in New York City, against the defendants, The Grapette Company, Inc., and Grapette-Aristocrat, Inc., Arkansas Corporations, having their offices and principal places

1. Grapette-Aristocrat, Inc., is a wholly-owned subsidiary of The Grapette Company, Inc., and will be collectively referred to as "defendant".

costs, the sum of $10,000.00. (28 U.S.C. § 1332)

The complaint of the plaintiff alleges that the defendant's use of PEPPY and its labels, signs, prints, boxes, packages, advertisements, etc., in the production and distribution of soft drinks is an infringement on various trade-marks owned by the plaintiff.

The plaintiff is now and has been for several years one of the largest and best known manufacturers of concentrates, syrups and ingredients from which soft drinks are made and has become one of the largest advertisers of soft drinks. Through numerous subsidiaries the plaintiff manufactures and sells its advertised products and also distributes soft drinks through various and sundry independent bottlers throughout the country under franchises.

Plaintiff is the registered proprietor of trade-marks PEPSI-COLA, PEPSI and PEP-KOLA, which are duly registered in the United States Patent Office under the following numbers: PEPSI-COLA: No. 40,619 dated June 16, 1903, and duly republished and renewed under the Act of July 5, 1946, in Class 45, soft drinks and carbonated waters; PEPSI-COLA: No. 55,199 dated August 7, 1906, and duly republished and renewed under the Act of July 5, 1946, in Class 45, soft drinks and carbonated waters; PEPSI-COLA: No. 349,886 dated September 14, 1937, and duly republished and renewed under the Act of July 5, 1946, in Class 45, soft drinks and carbonated waters; PEPSI-COLA: No. 349,985 dated September 14, 1937, and duly republished and renewed under the Act of July 5, 1946, in Class 45, soft drinks and carbonated waters; PEPSI-COLA: No. 350,201 dated September 21, 1937, and duly republished and renewed under the Act of July 5, 1946, in Class 50, merchandise not otherwise classified; PEPSI-COLA: No. 356,723 dated May 10, 1938, and duly republished and renewed under the Act of July 5, 1946, in Class 2, receptacles; PEPSI-COLA: No. 369,426 dated July 25, 1939, and duly republished and renewed under the Act of July 5, 1946, in Class 31, filters and refrigerators; PEPSI: No. 111,508 dated July 18, 1916, and duly republished and renewed under the Act of July 5, 1946, in Class 45, soft drinks and carbonated waters; PEP-KOLA: No. 51,959 dated May 1, 1906, and duly renewed and republished under the Act of July 5, 1946, in Class 45, soft drinks and carbonated waters; PEPSI: No. 824,150 dated February 14, 1967, in Class 45, soft drinks and carbonated waters; and PEPSI-COLA: No. 824,151 dated February 14, 1967, in Class 45, soft drinks and carbonated waters.

PepsiCo, Inc., is a holding company which operates through numerous subsidiaries all of which are incorporated. The soft drink business of the company is carried on through its wholly-owned subsidiary Pepsi-Cola Company. Pepsi-Cola originated in Newbern, North Carolina, by Caleb Bradham in 1898. The first Pepsi-Cola Company was organized in 1902 under the laws of North Carolina. It first was sold as a fountain beverage and subsequently distributed as a bottle drink. The present company acquired the business including the trademarks by assignment in 1932. It is operated on a national basis.

The plaintiff company owns and operates four plants in the manufacture of its concentrates or syrups. It owns and operates twenty-four bottling plants and has approximately five hundred franchise bottlers for its products in the United States. Substantial funds are expended each year in the advertising of its products.

While the plaintiff's trade-mark PEP-KOLA is not so highly advertised, its registration and use have been maintained by the plaintiff over the years and has been associated with the plaintiff's advertised trade-marks PEPSI-COLA and PEPSI. Only small quantities of PEP-KOLA are sold each year on a regular basis.

The defendant is engaged in the manufacture, sale and distribution of soft drinks and the ingredients used in the preparation thereof for sale to the general public. B. T. Fooks is the defendant's chief executive officer. He first started the business in 1926 with the purchase of a local bottling plant and began manufacturing his own flavors (concentrates) in 1928. He began expanding the business in the early thirties and perfected the Grapette soft drink in 1940. The company was first incorporated in 1940 as a family business and in 1946 the defendant, The Grapette Company, was incorporated, but continuing as a family-owned business, primarily.

Just as it is with the plaintiff, the defendant produces and distributes various soft drinks in what is known as "Class 45" on a national basis through franchise bottlers. Substantial funds are expended each year in a cooperative advertising program where the parent company and the bottlers match funds for the payment of advertising common to the beverage industry. It operates on a national basis through some two hundred bottlers.

In 1926 H. Fox & Company, a partnership consisting of Herman Fox and his wife, Ida Fox, obtained a registered trade-mark PEPPY from the United States Patent Office in Class 45 for nonalcoholic maltless beverages and syrups therefor under Trade-Mark No. 211,209. The registration was renewed in 1946 as is required by law and again in 1966. The H. Fox & Company partnership started as a business about 1920. It was a family partnership. It was established in Brooklyn, New York, manufacturing concentrates and distributing soft drinks under the registered trade-mark PEPPY along with other soft drink beverages from time to time. The manufacturing plant and business has been operated at the same location and in the same building for many years. H. Fox & Company incorporated in 1932, but also continued the partnership. The corporation owned the real estate of the company.

The beverage PEPPY started as a ginger-bitter type syrup and subsequently became a cola-flavored syrup. It was distributed largely in the New York metropolitan area, New Jersey and Connecticut, although it had sales at intervals in Florida, California and a minimal in Philadelphia and Cleveland, Ohio. H. Fox & Company as a partnership and corporation has been in continuous operation as a manufacturer of concentrates and distribution of soft drinks largely in the metropolitan area of New York, Connecticut and New Jersey since about 1930. At times its maximum use of the PEPPY trade-mark was 350 gallons of concentrate per week.

The defendant has manufactured and distributed a "pepper" type beverage, fruit-flavored in contrast to the plaintiff's cola-type beverage. Both are brown-colored, carbonated and contain caffeine. The defendant developed a formula for a new product and was seeking a trade-mark which could be used to identify it and under which it could be marketed.

In September, 1965, the defendant's chief executive officer, Mr. Fooks, purchased from H. Fox & Company, Inc., its registration No. 211,209 for the trade-mark PEPPY. Pursuant to the purchase an assignment was made by Irving Fox, president of H. Fox & Company, Inc., to the defendant of its trade-mark PEPPY and its registration No. 211,209.

At the same time the defendant and H. Fox & Company, Inc., entered into an additional agreement whereby Fox Corporation would be given a franchise as a bottler-distributor for the PEPPY beverage in its sales territory consisting of most of the state of New York, including Metropolitan New York, New Jersey and Connecticut.

The defendant proceeded to the continued use of the trade-mark PEPPY but on a wider basis throughout the country and substantial funds were expended toward this objective. It dis-

played its new pepper-type beverage under the trade-mark "PEPPY" at a convention of soft drink bottlers in Miami, Florida, in November, 1965. It was from this incident the plaintiff objected to the defendant's use of its recently acquired assignment of the trade-mark PEPPY, which brought about the commencement of this proceeding.

During the trial testimony was offered by the defendant to include third-party registrations to show that a large number of trade-marks containing the word "PEP" have been registered in the Patent Office and the common use of "PEP" as a trade-mark component in connection with soft drinks and related goods. The court reserved judgment on the proffer as to the admissibility of the evidence. The court is of the opinion that the evidence is relevant for the purposes offered.

During the time of the taking of the deposition of Irving Fox, Mr. Fox testified, "The period while we were selling our own Fox's PEPPY COLA, we were approached by Bob Sealfon and we had a meeting with the general sales manager of Pepsi-Cola at that time, and I'm trying to think of his name and I can't * * *. The name of the man we met with, I'm pretty certain he was a sales manager for the Pepsi-Cola at that time that worked with Bob Sealfon, they met with me. I think he and Bob Sealfon, one of Bob Sealfon's men, Lester Horn, who was very active with Bob Sealfon at that time, and another representative of the Pepsi-Cola Company came to my office. We discussed whether or not I would handle PEPSI-COLA.

"I don't think I have to go into how, you know, how deep the discussion was, but I will say, at that time I made them aware of the fact that I had a cola and that the name of the cola was PEPPY and I think it was laughed off at that time."

This testimony was objected to by the plaintiff as hearsay. Mr. Sealfon was a distributor under a franchise in this area for PEPSI-COLA and related prod-

ucts. The testimony related to the fact that the plaintiff knew the PEPPY trade-mark was in use in the same area where its product is sold. It was acknowledged that Mr. Sealfon, even though a franchise distributor, was not an agent of Pepsi-Cola. The unnamed sales manager of Pepsi-Cola was represented to him as an agent of the company. The purpose was to get H. Fox & Company to dispense with the distribution of its PEPPY drink and distribute PEPSI-COLA products. The plaintiff contends that such representation was hearsay and objected to its admissibility. This incident occurred in 1953 or thereabout.

Mr. Fox testified further on cross-examination:

"Q And it was at that time that you said that Mr. Sealfon was made aware that you had a PEPPY product?

A Yes.

Q Did you say that someone was with him?

A From the Pepsi-Cola Company, yes.

Q Who was that?

A I don't recall the name, no.

Q How do you know he was from the Pepsi-Cola Company?

A He gave me a card and all. He was a Pepsi-Cola man. He was working with Bob Sealfon at the time, representing the fountain syrup division of Pepsi-Cola. I can get that name easy enough, perhaps, from Bob Sealfon or Lester Horn or—

Q You are not contending that Sealfon was an employee of Pepsi-Cola?

A No, no, he was a franchised, I think, a franchised bottler of syrups only.

Q He wasn't conducting negotiations on behalf of Pepsi-Cola, was he?

A No, he brought a Pepsi-Cola man in to me and a Pepsi-Cola—

Q But you don't recall the name?

A I don't recall his name. He was a sales manager, at the time, of foun-

tain syrup sales, and he came into my office with Sealfon and Lester Horn and I think another man from Pepsi-Cola Company, Syrup Division, too."

This is an equity proceeding and the testimony will be received and considered only to the extent of its relevancy, materiality and as proper under the rules.

There was other testimony presented with certain exhibits and depositions of the parties on which the court reserved judgment. Such testimony will be received, together with the exhibits, and considered as to its relevancy and materiality.

From the extensive record, testimony of the parties, stipulations, numerous exhibits, various and sundry briefs, there are three basic issues for the court's determination which will be considered in the following order:

1. The question of confusing similarity between the registered trade-marks PEPPY and PEPSI-COLA, PEPSI and PEP-KOLA.

2. The validity of the assignment of the trade-mark PEPPY by the H. Fox & Company, Inc., to The Grapette Company, Inc., and

3. The defense of estoppel, laches and acquiescence by the defendant.

Jurisdiction is established. Lanham Trade-Mark Act of 1946, as amended, (15 U.S.C.A. § 1051 et seq.) (28 U.S.C.A. §§ 1338 and 1391) (28 U.S.C.A. § 1332).

Plaintiff is the registered proprietor of trade-marks PEPSI-COLA, PEPSI and PEP-KOLA duly registered in the United States Patent Office, which have become incontestable. (15 U.S.C.A. § 1065)

The plaintiff has therefore established a valid right with its continued use of its registered trade-marks which have attained a secondary meaning identifying the products of the plaintiff with the general public. Drexel Enterprises,

Inc. v. Hermitage Cabinet Shop, Inc., D. C., 266 F.Supp. 532, 536 (1967).

H. Fox & Company, a partnership, became the registered proprietor of trademark PEPPY duly registered in the United States Patent Office on April 6, 1926, under the Act of 1905, for goods in Class 45, nonalcoholic maltless beverage and syrup, under No. 211,209. H. Fox & Company renewed the registration on April 6, 1946, for an additional period of twenty years. The trade-mark registration was not republished under Section 12(c) of the Trade-Mark Act of July 5, 1946 (Lanham Act), and therefore did not become incontestable. (15 U.S.C.A. § 1065).[2] H. Fox & Company established a valid right by the continued use of the trade-mark PEPPY under the registration, unabandoned by any prior dealings. The plaintiff has not questioned the validity of the registered trade-mark by H. Fox & Company and the right to its use from the time of its registration in 1926 until its assignment to The Grapette Company, Inc., in September, 1965.

We therefore arrive at the first and primary question in this case, namely, whether the trade-mark PEPPY of the defendant and the trade-marks PEPSI-COLA, PEPSI and PEP-KOLA are confusingly similar. Both parties agree that the central issue in the case is this threshold question of confusing similarity. There have been numerous citations holding other marks confusingly similar or dissimilar. This is typical. They are so numerous it appears that citations can be used to prove or disprove any contention without providing a satisfactory basis for an ultimate conclusion. Drexel Enterprises, Inc. v. Hermitage Cabinet Shop, Inc., supra.

■ "Each case stands upon its own peculiar facts. Dietene Co. v. Dietrim Co., supra, p. 243 of 225 F.2d." David Sherman Corporation v. Heublein, Inc., 340 F.2d 377, 380 (8 Cir. 1965).

---

**2.** The required affidavit has been filed by the defendant for republishing under Section 12(c) of the Lanham Trade-Mark Act of July 5, 1946, and is now pending.

This issue may be narrowed as contended by the plaintiff that the defendant's trade-mark PEPPY for Class 45, soft drinks, is so similar to the plaintiff's trade-marks PEPSI-COLA, PEPSI and PEP-KOLA as to amount to a *colorable imitation likely* to cause confusion or mistake or deceive purchasers as to the source of the contents.

Section 32 of the 1946 Lanham Trade-Mark Act, as amended, 15 U.S.C. A. § 1114, provides:

"(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or *colorable imitation* of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely* to cause confusion, or to cause mistake, or to deceive; * * *" (Emphasis supplied)

15 U.S.C.A. § 1127, provides:

"The term 'colorable imitation' includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive."

The standard as the language of the statute indicates is "likelihood of confusion" and deceit of actual or prospective purchasers. "Whether the similarity deceives or is likely to deceive is a question of fact. Cleo Syrup Corp. v. Coca-Cola Co., supra, p. 417 of 139 F.2d; Seven Up Co. v. Cheer Up Sales Co., supra, p. 911 of 148 F.2d; Star Bedding Co. v. Englander Co., 239 F.2d 537, 543 (8 Cir. 1957); Neely v. Boland Mfg. Co., 274 F.2d 195, 201 (8 Cir. 1960)." David Sherman Corporation v. Heublein, Inc., supra.

It is well settled in trade-law that, "It is not necessary to show actual deceit. 'It is sufficient to show that such deception will be the natural and probable result of the defendant's acts'. Queen Mfg. Co. v. Isaac Ginsberg & Bros., 25 F.2d 284, 288 (8 Cir. 1928);

Esso, Inc. v. Standard Oil Co., 98 F.2d 1, 5–6 (8 Cir. 1938); United Drug Co. v. Obear-Nester Glass Co., 111 F.2d 997, 1000 (8 Cir. 1940), cert. denied 311 U.S. 665, 61 S.Ct. 22, 85 L.Ed. 427." David Sherman Corporation v. Heublein, Inc., supra (340 F.2d at page 379).

The purchaser of soft drinks, whether it be for the plaintiff's PEPSI-COLA, PEPSI or PEP-KOLA or the defendant's PEPPY is the ordinary person who uses ordinary caution " 'buying under the usual conditions prevailing in the trade, and giving such attention as such purchasers usually give in buying that class of goods', Queen Mfg. Co. v. Isaac Ginsberg & Bros., supra; Seven Up Co. v. Cheer Up Sales Co., supra, or, as has been said otherwise, 'an ordinarily prudent purchaser'. United Drug Co. v. Obear-Nester Glass Co., supra; S.S. Kresge Co. v. Winget Kickernick Co., 96 F.2d 978, 987 (8 Cir. 1938), cert. denied 308 U.S. 557, 60 S.Ct. 79, 84 L.Ed 468; F. W. Fitch Co. v. Camille, Inc., 106 F. 2d 635, 639 (8 Cir. 1939)."

In the case of David Sherman Corporation v. Heublein, Inc., supra, 340 F.2d at p. 380, apposite to the instant case, Judge Blackmun, for the court, stated the following general rules:

" '[S]imilarity of sound, as well as appearance, of the words or letters may constitute infringement.' Esso, Inc. v. Standard Oil Co., supra, p. 5 of 98 F.2d. To the same effect are La-Touraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 117 (2 Cir. 1946), cert. denied 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663; Abramson v. Coro, Inc., 240 F.2d 854, 857 (5 Cir. 1957); and Sterling Drug, Inc. v. Lincoln Laboratories, Inc., 322 F.2d 968, 971 (7 Cir. 1963).

"Some dissimilarity in form and color is not conclusive against infringement. Infringement may exist 'where the substantial and distinctive part of the trademark is copied or imitated'. Queen Mfg. Co. v. Isaac Ginsberg & Bros., supra, p. 287 of 25 F. 2d; Reid, Murdoch & Co. v. H. P.

Coffee Co., 48 F.2d 817, 819 (8 Cir. 1931), cert. denied 284 U.S. 621, 52 S.Ct. 9, 76 L.Ed. 529.

"The plaintiff has the burden of proof. Checker Food Prod. Co. v. Ralston Purina Co., 232 F.2d 477, 481 (8 Cir. 1956). The burden may be sustained by proving actual deceit of purchasers or the likelihood of their deceit. Cleo Syrup Corp. v. Coca-Cola Co., supra, p. 418 of 139 F.2d."

These general rules are applicable to this case. In addition, the soft drinks of the class involved here have been distributed side by side by the use of the respective trade-marks in the same market place for some forty years. The defendant contends that no deception or confusion has been shown and "not a single incident has been reported" during this period of time. The defendant insists that this is strongly probative and furthermore that there is no evidence of copying. The color scheme and labels are conventional.

In the David Sherman Corporation case, supra, 340 F.2d at p. 380, the court further stated:

"We recognize that the courts have regarded the absence of actual confusion as an important factor. Indeed, on occasion they have gone so far as to say that the best test of proving likelihood of deception is actual deception itself. Lapointe Machine Tool Co. v. J. N. Lapointe Co., 115 Me. 472, 99 A. 348, 354 (1916); Plough, Inc. v. Kreis Laboratories, 314 F.2d 635, 639–640 (9 Cir. 1963); Mishawaka Rubber & Woolen Mfg. Co. v. Panther-Panco Rubber Co., 153 F.2d 662, 665 (1 Cir. 1946), cert. denied 329 U. S. 722, 67 S.Ct. 64, 91 L.Ed. 625; Societe Anonyme, etc. v. Julius Wile Sons, 161 F.Supp. 545, 548 (S.D.N.Y. 1958); Eastern Wine Corp. v. Winslow-Warren, Ltd., 137 F.2d 955, 960 (2 Cir. 1943), cert. denied 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452. This court itself has said, in Maas & Waldstein Co. v. American Paint Corp., 288 F.2d 306, 307 (8 Cir. 1961);

" 'It is significant, though not controlling, that during the years the two trade-marks have been used in the same territory by their respective owners, no instances of deceit or confusion in respect to them has been shown * * *.'

"And in Star Bedding Co. v. Englander Co., supra, p. 543 of 239 F.2d, we indicated that absence of evidence of confusion was supportive of a trial court's finding that there was no likelihood of confusion."

In applying the statutory standard it is usually most difficult to ferret out actual confusion even though it may exist. It is also recognized that mere passage of time is not to be accepted as a factor which avoids or which renders inapplicable the stated statutory standard. It is the circumstances surrounding the individual case as has been pointed out that determines the issue of confusing similarity. David Sherman Corporation v. Heublein, Inc., supra, 340 F.2d at p. 381 and cases cited therein.

In applying these standards to the instant case, it is clear that the testimony fails to support the conclusion that there is confusing similarity between the defendant's trade-mark PEPPY and the plaintiff's trade-marks PEP-SI-COLA and PEP-KOLA.

Each have used their trade-marks by associating them with the goods as a means of identification that is of the origin or ownership and hence a symbol of good will. This is an essential element of both trade-mark infringement and unfair competition. The law of trade-mark is but a part of the law of unfair competition. Seven Up Co. v. Cheer Up Sales Co. of St. Louis, Mo., 148 F.2d 909 (8 Cir. 1945).

It is not claimed in this case that the trade-mark PEPPY is a copy of the plaintiff's trademarks but a colorable imitation thereof. There is no evidence of "palming off". The question is therefore determined solely upon the comparison of the trade-marks, the appearances of the packages, labels, etc.

The reoccurrence of "PEP" in the defendant's trade-mark PEPPY and the plaintiff's trade-marks PEPSI-COLA and PEP-KOLA does not of itself tend to deceive the ordinary prudent person or create confusion in the mind of the ordinary purchaser.

In Seven Up Co. v. Cheer Up Sales Co., supra, at p. 912, where the situations on this question are identical to the instant case, the court said:

"The ordinarily prudent purchaser would not be deceived into thinking that 'Cheer Up' is the same product as 'Seven-Up' or '7 Up' since there is no such similarity between the appearance or sound of 'Cheer Up' on the one hand and 'Seven Up' or '7 Up' on the other hand, as would induce such deception or confusion."

The Court is of the opinion that the evidence in this case supports a similar conclusion as to the issue between the trade-mark PEPPY and the trade-marks PEPSI-COLA and PEP-KOLA.

The plaintiff places great emphasis on the unreported case of Pepsi-Cola Company v. Dr. Pepper Company (N.D.Tex., Dallas Div.1963) (C.A. 3–63–56) wherein the court found from the testimony an infringement of confusing similarity of the use of the word "PEP". In examining that case and numerous other cases cited by the plaintiff, I do not find the circumstances and available information contrary to the conclusions reached herein. There it appears to have been a question as to the use of the word "PEP" between the parties and also a much more sensitive question of the Pepsi-Cola Company inducing bottlers away from the Dr. Pepper Company.

The circumstances of that case are obviously distinguishable from the testimony giving the historical background of the uses of the trade-marks involved in the instant case.

█ However, the Court is of the opinion that in light of the general principles stated for this circuit, and the applicable statutory standards, the testimony is conclusive that the trade-mark

PEPPY of the defendant and the trade-mark PEPSI of the plaintiff are confusingly similar.

The names are identical in their first three letters and differ only in "py" and "si". They are similar in sound and strikingly alike when spoken. The product for which each is used is of Class 45, soft drinks. Each are available on the retailers shelves in New York, New Jersey and Connecticut. The cases providing examples of comparable similarity between registered and offending marks are numerous where relief has been granted. Cleo Syrup Corp. v. Coca-Cola Co., supra, 139 F.2d 416 (soft drinks; Cleo Cola, as violative of Coca-Cola); Dietene Co. v. Dietrim Co., supra, 225 F.2d 239 (food supplements; Dietrim as violative of Dietene); Esso, Inc. v. Standard Oil Co., supra, 98 F.2d 1 (petroleum products; Esso as violative of S O and Standard Oil); LaTouraine Coffee Co. v. Lorraine Coffee Co., supra, 157 F.2d 115 (coffee; Lorraine as violative of LaTouraine); United Drug Co. v. Obear-Nester Glass Co., supra, 111 F. 2d 997 (prescription bottles; The Rexall Store as violative of Rex); Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., 281 F.2d 755 (2 Cir. 1960), (men's hair dressing; Valcream as violative of Brylcreem); Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602 (shoes and hosiery; Gropals as violative of Groshoe); Parke, Davis & Co. v. G. F. Harvey Co., 141 F.2d 132, 31 CCPA 879 (1944), (digitalis preparations; Digiseals as violative of Kapseals Digifortis); Suzuki & Co. of New York v. Maggi Co., 117 F.2d 562, 28 CCPA 928 (1941) (seasoning; aji as violative of Maggi).

█ "It has been said that where products are 'virtually identical', as with alcoholic beverages, 'the degree of similarity in the marks necessary to support a finding of infringement is less than in the case of dissimilar, noncompeting products'. A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc., supra, pp. 826, 827–828 of 198 F.Supp." David

Sherman Corporation v. Heublein, Inc., p. 382 of 340 F.2d.

Here, the names are amazingly close. Confusion is not only likely but probable. The Court is constrained to hold that the conclusion reached on this delicate and important question comports with the testimony when applied to the standards so well established in cases of this kind.

The second major issue for determination is the validity of the assignment of the trade-mark PEPPY from H. Fox & Company, Inc., and its predecessor, H. Fox & Company,[3] to The Grapette Company, Inc.

15 U.S.C.A. § 1060. Assignment of mark; etc., provides:

"A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark, and in any such assignment it shall not be necessary to include the goodwill of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted. Assignments shall be by instruments in writing duly executed. Acknowledgment shall be prima facie evidence of the execution of an assignment and when recorded in the Patent Office the record shall be prima facie evidence of execution. * * *"

The plaintiff insists that this is a "naked" trademark assignment without the goodwill of the particular business. In support of this contention, numerous decisions are cited, together with Restatement of Torts. To adopt the plaintiff's contention, it apparently would require the sale or transfer of the busi-

ness of the assignor, including facilities, records, personnel as well as the goodwill of the business.

■■■■ While it is correct that the statutory standard requires assignment of the goodwill of a business or that part of the goodwill of the business connected with the use of and symbolized by the mark, it is not necessary to include the goodwill of the business connected with the use of and symbolized by any *other* mark used in the business or by the *name* or *style* under which the business is conducted.

It is clearly shown by the testimony, and it is undisputed, that the Fox Partnership and the Fox Corporation have made continuous use of the trade-mark PEPPY since about 1930 in the New York, New Jersey and Connecticut area. Irving Fox, son of Herman and Ida Fox, testified that he started working for the company as a teenager about 1930. This was about the time that the plaintiff company acquired PEPSI-COLA. Concurrent use of the two products by their trade-marks was made continuously throughout the years in the same area. They were both in commerce and the difference on a progressive basis has been the degree or extent of the use geographically. However, no limitation as to area has been placed on either, although the use of the product by trademark PEPPY was more concentrated in these highly populated areas.[4]

It was under these circumstances of continued use the assignment was made to The Grapette Company. The trademark assignment includes the "Trade-Mark PEPPY, Registration No. 211,209, dated April 6, 1926, and renewed April 6, 1946, for a period of twenty years, together with the goodwill with which said trade-mark has been used, etc."

As a further example of the intention of the parties there was a related agree-

3. H. Fox & Company will be referred to as "Fox Corporation". H. Fox & Company as a partnership will be referred to as "Fox Partnership".

4. At varying times during the years that Fox used the trade-mark PEPPY shipments of the product were made, though limited, to Florida, California, Ohio and Pennsylvania.

ment in which Fox again confirmed the assignment of the trade-mark and registration No. 211,209 and of the "goodwill thereof", with all right, title and interest thereto, and at the same time became an agent for the distribution of the product from The Grapette Company in the same "area" utilizing the same facilities in connection with the sale and distribution of the Grapette product under the assigned trade-mark PEPPY. This clearly demonstrates that it was the intention of the parties that Fox assign all right, title and interest of the trademark and registration, together with that part of the goodwill of the business connected with the use and symbolized by the mark.

The plaintiff has emphasized numerous decisions in stating the rule, many of which are misplaced. It is unnecessary to burden this record in pointing out the distinguishing factors on which the plaintiff relies. As an example, reliance is placed on the Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.2d 607. In that case the controversy was over the use of the same trade-mark "Haymaker". An examination of the decision written by Circuit Judge Hincks for the court, Second Circuit, reveals that the question was determined on two critical findings, (1) good faith, and (2) confusing similarity. In weighing the "equities" the court there said at p. 613: "This process is more accurately described as balancing the *conflicting interests* both parties have in the unimpaired continuation of their trademark use."

There is no evidence of fraud or misrepresentation in connection with the assignment of the trade-mark PEPPY. Neither does the testimony disclose any lack of good faith. It is clear that the defendant had knowledge of the plaintiff's trade-marks. They were not identical with PEPPY. The defendant was seeking a trade-mark for the new product in the normal course long recognized in business. Not only was the Fox Company using "PEPPY" at the time of as-

signing the mark, but the defendant proceeded to its use after the assignment.

The same contentions made by the plaintiff in this case were made in the recent case of Hy-Cross Hatchery, Inc. v. Osborne, 303 F.2d 947, 49 CCPA 1163 (1962). In that case, which is apposite to the issue here, the court stated at p. 950:

"However, we do not believe that the assignment was invalid. Unlike the cases relied on, Osborne, so far as the record shows, was using the mark at the time he executed the assignment of it. He had a valid registration which he also assigned. With these two legal properties he also assigned, in the very words of the statute, 'that part of the goodwill of the business connected with the use of and symbolized by the mark * * *'. He was selling chicks which his advertising of record shows were designated as 'No. 111 HY-CROSS (Trade Mark) AMERICAN WHITES'. As part of his assignment, by assigning the goodwill, he gave up the right to sell 'HY-CROSS' chicks. This had been a part of his 'business'. By the assignment Welp, the assignee, acquired that right. The record shows that he began selling 'Hy-Cross Hatching Eggs' and chicks designated as 'HY-CROSS 656'. Thus, what had once been Osborne's business in 'HY-CROSS' chicks became Welp's business. We do not see what legal difference it would have made if a crate of eggs had been included in the assignment, or a flock of chickens destined to be eaten."

The plaintiff further contends that the assignment was invalid since Fox Corporation was involved in a Chapter XI Bankruptcy proceeding. It is contended that the trade-mark PEPPY was not included in the proceeding as belonging to the company.

The bankruptcy proceeding was started in April, 1965. The trade-mark was still registered in the name of the Fox Partnership. It had not been formally assigned to Fox Corporation. Irving

Fox was president of the Fox Corporation. He and his two sisters were the surviving children of Herman and Ida Fox. There is no testimony that disproves that he was acting in behalf of the three surviving children and apparently it was accepted by the Patent Office.

■ Just why the assignment to Fox Corporation is not clear. This was in September, 1965, and whether it was then reported as a part of the bankruptcy proceedings is not disclosed. Neither is any question raised as to the authority of Irving Fox, president of the corporation, making the assignment of the trade-mark and registration with the goodwill that goes with it to the defendant. In light of these circumstances and the record, the Court is of the opinion that the assignment of the trade-mark and registration was within the statutory standard and valid.

■ Finally, the defendant claims laches, estoppel and acquiescence as an affirmative defense. The burden is on the defendant. Drexel Enterprises, Inc. v. Hermitage Cabinet Shop, Inc., 152 USPQ 484.

■ As pointed out in the plaintiff's brief, it is well established that the doctrine of laches in a trade-mark case is conditioned upon a showing of factors other than mere lapse of time; there must be elements of equitable estoppel. Laches is not a limitation as merely a matter of time. Galliher v. Cadwell, 145 U.S. 368, 12 S.Ct. 873, 36 L.Ed. 738; National Circle, Daughters of Isabella v. National Order of Daughters of Isabella, 2 Cir., 270 F. 723; McWilliams v. Excelsior Coal Co., 8 Cir., 298 F. 884; Spiller v. St. Louis & S.F.R. Co., 8 Cir., 14 F.2d 284.

■ It has long been the rule that, "Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, *unless it has continued so long and under such circumstances as to defeat the right itself*." Menendez v. Holt, 128 U.S. 514, 523, 9 S.Ct. 143, 145, 32 L.Ed. 526, 529. (Emphasis supplied)

■ The trade-mark PEPPY was registered in 1926 under the 1905 Act. "Registrations under the 1905 Act are public records and as such constitute such constructive notice as will preclude a cancellation petitioner from pleading ignorance of the existence of a particular mark." Willson v. Graphol Products Co., 188 F.2d 498, 504, 38 CCPA 1030.

The testimony discloses that the plaintiff was aware of and knew of the registration and existence of the defendant's trade-mark PEPPY. The plaintiff insists that it did not know of its use. Knowledge of the use of a trade-mark is necessary. The defendant relies on the fact that the plaintiff had constructive notice. There is some question as to actual notice.

In addition to the fact that both products were dispensed in the same market over a period of forty years, the record discloses that there were some thirty-eight registrations during the years with the word "PEP". Some were abandoned, some were used and some are still in use.

■ Knowledge on the part of the party affected is essential. "Laches cannot exist unless and until a party has legal knowledge of the facts affecting his rights." McWilliams v. Excelsior Coal Co., 298 F. 884, 887 (8 Cir. 1924)

In 1939 the plaintiff caused a research to be made of the registrations, existence and use of trade-marks.[5] It

---

5. Q (MR. GIPPLE, continuing): (Handing report to witness.) Mr. Martin, is that paper that I have just handed you, is that an excerpt from the report of 1939 that we have previously discussed here?
A I understand it is, yes, sir.

Q And there is no question in your mind that the predecessor of the present plaintiff did receive that report?
A Well, the Pepsi-Cola Company received it, but it is not a predecessor of the present plaintiff. I guess that answers your question better, doesn't it?

was revealed that the trade-mark PEPPY was included in the report which was for the special use of the plaintiff company. Notwithstanding this information and knowledge as to the registration and existence of the trade-mark PEPPY no action was taken by the plaintiff company.

The plaintiff has consistently pursued a policy of inducing bottlers to give up the distribution of competitive products for the handling and distribution of its products. This was one of the questions in the case of Pepsi-Cola Company v. Dr Pepper Company, in the N.D., Texas, Dallas Division.

Mr. Fox testified in 1953 that he was induced to give up his PEPPY cola product for PEPSI-COLA. He testified a representative sales manager of Pepsi-Cola along with an acknowledged bottler of Pepsi-Cola visited him for this purpose. The Court does not consider this testimony proper under the rule. It may be inferred from all of the other facts that there was an inducement and, if so, further evidence of actual knowledge.

The testimony also revealed that the plaintiff pursued a policy of purchasing trade-marks that included the word "PEP"; such was the case with PEPSOL.[6] An effort was made to purchase the trade-mark PEP-SO. The plaintiff maintained a continuing policy and going "after them" on information or reports involving infringement of their trade-marks.

Under these circumstances which the record clearly discloses, it is difficult to perceive that two products in the same class being distributed in the most densely populated areas of the nation at that time could have continued for a pe-

There is no question in my mind that the company received this report from Professor Handler.

MR. GIPPLE: Your Honor, I will ask that it be marked for identification and we will offer it in evidence later.

Q (MR. GIPPLE, continuing): Who in 1939 was the outside trademark counsel?
A Professor Handler.
Q Was it your opinion at that time that he was an expert in the trademark field?
A Yes, sir.
Q And I trust that opinion has not changed?
A Not materially.

6. Q Mr. Martin, are there other registered trademarks containing the letters PEP besides PEPPY, of which the Plaintiff has become aware?
A Yes, sir.
Q Could you tell us in general what those trademarks were and what is the extent of your knowledge, the company's knowledge?
A The trademark PEPSOL, we learned it was in use and we arranged to purchase it. We purchased the stock of the small Pepsol Corporation, which we now own and which is still in operation to that extent. The trademark PEP-SO we found out was in use and we went after them. We offered—we did not offer, we tried to negotiate the purchase of the trademark PEP-SO and its business. They were operating at the time, and I think still are, only in and around Denver, Colorado, a very tiny operation, but we could get to no agreement as to the price they wanted for it, so we did not purchase it. We did, however, warn them that—at one time they announced they were going to start a national distribution, and we warned them what would happen from our point of view if they did, and it never took place.
Q Were there any other marks that you became aware of as having been registered in the patent office?
A Well, when Dr Pepper began to change their name to PEP we were aware of that, and they, I think, registered the word PEPPER but they are not using it.
Q But in the case of the Dr Pepper's use of PEP what did Pepsi-Cola do?
A Brought actions in the District Court in Dallas to enjoin its use.
Q Any other registrations of which you became aware?
A Well, a number of them that we became aware of from the reports, that you as trademark counsel sent in, but most of them were abandoned, were not used, and we had a very comprehensive method of seeing what trademarks were in use. Our field men, our bottlers, everyone was alerted to do it, to find it, let us know at once if there was anything of use. We went after them, that was our policy. Most of those trademarks with PEP in them have been allowed to expire. As far as I know, have never been any in use.

riod of some thirty-five years without the knowledge and acquiescence of the other.

In Polaroid Corporation v. Polarad Electronics Corp., D.C., 182 F. Supp. 350, 355, aff'd 2 Cir., 287 F.2d 492 (1961) the court stated:

"While it is true that the facts in the case of Johnston v. Standard Mining Co., 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480, were entirely dissimilar from those in the case at bar, the principle enunciated there is equally applicable here. At page 370 of 148 U.S., at page 589 of 13 S.Ct. the Court said: '* * * the law is well settled that, where the question of laches is an issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.'"

In 1939, the plaintiff, according to its own investigation, and from its own confidential Handler Report had actual knowledge of the trade-mark PEPPY. Had it proceeded at that time there may have been some question of success. The fact remains that nothing was done until the trade-mark had attained a second meaning and what had developed into a substantial business was on the verge of serving a wider interest.

From the voluminous record of the testimony in this case the Court has no difficulty in arriving at the conclusion that the plaintiff has been guilty of laches in failing to assert any rights it may have had against the defendant, or its predecessor, for a period of more than thirty years of its registration and use. Plaintiff's conduct has been inconsistent with its assertion of alleged exclusive rights. The defendant had a right to rely upon the continuation of such conduct. The defendant would suffer irreparable injury if enjoined from the continued use of the PEPPY trademark and the plaintiff is equitably estopped from obtaining injunctive relief from the infringement requested in this equitable proceeding.

The requests of the plaintiff are denied. The complaint will be dismissed. An order will be entered accordingly.